**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 06-20532-CIV-LENARD/TORRES

CATALINA RENTAL APARTMENTS, INC.,

        Plaintiff,

vs.

PACIFIC INSURANCE COMPANY, LTD.,

        Defendant.
_____/

**ORDER DENYING PLAINTIFF'S *DAUBERT* MOTION TO
PRECLUDE THE TESTIMONY OF DEFENDANT'S EXPERT DAVID WILLS**

This matter is before the Court on Plaintiff's *Daubert* Motion to Preclude the Testimony of Defendant's Expert David Wills [D.E. 98]. After considering the arguments raised in the parties' briefs and at oral argument, and after conducting a *Daubert* evidentiary hearing, the Court concludes that Defendant's expert is proposing to testify to reliable scientific knowledge that will assist the trier of fact to understand or determine a fact in issue. As such, Plaintiff's *Daubert* Motion to Preclude the Testimony of Defendant's Expert David Wills is denied for the reasons set forth below.

### I.  BACKGROUND

Catalina Rental Apartments, Inc. ("Catalina") sued Pacific Insurance Company, Ltd. ("Pacific") for breach of contract, alleging that Pacific improperly denied coverage under the insurance policy it issued Catalina for damages sustained by Catalina's apartment complex as a result of plumbing problems that were allegedly caused by muriatic acid that was poured down the drain pipe by Catalina's employees.

Defendant hired David Wills ("Wills") to examine the affected drain pipes, which were removed from Catalina. Wills ultimately concluded that the pipes had a life expectancy of twenty to thirty years.

Plaintiff now asserts in his motion that Wills's expert opinion regarding the life expectancy of the cast iron pipes at Catalina was based solely on two studies, only one of which he actually read. Plaintiff also alleges that Wills relied on studies that were not intended to project corrosion rates in real world conditions. Plaintiff further asserts that Wills's opinion was not based on any empirical analysis or testing of the pipes and that he only researched the literature on corrosion. In its motion, Plaintiff cites a survey from the National Association of Home Builders, concluding that the estimated life expectancy of cast iron waste pipes is one hundred years. Plaintiff also points to a club organized by the Ductile Iron Pipe Research Association that recognizes water utilities with cast iron pipes that have provided service for one hundred years or more. The club membership list does not specify whether the cast iron pipes were used as supply lines[1] (i.e., for drinking water) or as waste lines (i.e., for sewer services) or both. Plaintiff points out, however, that the membership list does include several "water and sewer" departments.

As to one of the studies relied on by Wills, an article by F.L. LaQue entitled "Corrosion Resistance of Ductile Iron", Plaintiff asserts that the purpose of the article was to compare the corrosion resistance of ductile iron and gray iron. To do so, according to Plaintiff, LaQue accelerated the corrosion process so the relative resistance of these two types of iron could be compared in only a seven-day time span. Plaintiff asserts that Wills mistakenly cited these accelerated corrosion rates.

---

[1] In its motion, Plaintiff acknowledges that supply lines generally last longer than waste lines.

As to the second study that Plaintiff contends Wills relied on, a study undertaken by Whitman, Russell and Altieri in 1924("Whitman study"), Plaintiff asserts that Wills never read the study. Wills cited a .01 inches per year rate of corrosion taken from a graph found in a textbook by Uhlig and Revie ("Uhlig") entitled "Corrosion and Corrosion Control." The graph in the Uhlig textbook was copied from the Whitman study. Plaintiff asserts that Wills's failure to read the Whitman study is fatal to his report because Uhlig adapted the graph to demonstrate how pH affects corrosion, not to project corrosion rates in real world situations. According to Plaintiff, Uhlig simplified the graph. In simplifying it, Uhlig left out all reference to how oxygen saturation would affect the rate of corrosion. He then purportedly recreated the Whitman graph based on an oxygen saturation rate of five cubic centimeters of oxygen per liter. Plaintiff contends that when the graph is improperly cited to project corrosion rates in real world situations, the omission of the interrelationship between oxygen saturation and corrosion rate is critical.

## II.  LEGAL STANDARD

When faced with a proffer of expert testimony under Rule 702, the party offering the expert testimony carries the burden of laying the proper foundation, and admissibility must be shown by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). Thus, the trial court must function as a gatekeeper and engage in a three-part inquiry to determine whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) (citing *Daubert v. Merrell Dow*

3

*Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993)).  The Eleventh Circuit has referred to these requirements as the "qualification," "reliability," and "helpfulness" prongs and, although there is inevitably some overlap, they remain distinct concepts that must be individually analyzed.  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

The Court's analysis must keep in in mind that "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd*, 326 F.3d 1333, 1341 (11th Cir. 2003); *Maiz v. Virani,* 253 F.3d 641, 666 (11th Cir. 2001) ("A district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'") (quoting *Allison,* 184 F.3d at 1311).  "Quite the contrary, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"  *Quiet Technology,* 326 F.3d at 1341 (quoting *Daubert,* 509 U.S. at 596).

### III.   ANALYSIS

#### A.   *Expert's Qualifications*

The Court finds that Wills is qualified to give an expert opinion on the life expectancy of cast iron drain pipes.  Wills is a managing engineer at a consulting engineering firm.  He has a bachelor of science degree in metallurgical engineering from the University of Mississippi and a master's degree in business administration from Nova Southeastern University.  His undergraduate degree included specialized training in the field of corrosion engineering. Specifically, he completed two courses in metallurgical thermodynamics.  Additionally, he completed graduate level courses in corrosion at Florida Atlantic University and completed a graduate level course in electron microscopy at Florida International University.  He is a licensed engineer in Florida and is a member

of the American Society for Materials, the American Welding Society and the National Association of Corrosion Engineers. He has also performed dozens of corrosion investigations and has previously been an expert in this area. Lastly, he has been qualified to give expert testimony in other litigation.

It is thus evident that Wills is properly qualified as an expert by virtue of his extensive education, training and experience. *See Quiet Technology,* 326 F.3d at 1343; *United States v. Paul,* 175 F.3d 906, 911 (11th Cir. 1998).

### B. *Reliability of the Expert's Methodology*

In determining the reliability of a scientific expert opinion, the Court considers:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Quiet Technology,* 326 F.3d at 1341 (citing *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)). This list of factors, however, does not exhaust the different considerations that may bear on the reliability of an expert opinion. *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)). "A federal court should consider any additional factors that may advance its Rule 702 analysis." *Id.* Some of those factors may apply in a given case, while others may not. "Whether the *Daubert* opinion factors are even pertinent to assessing reliability in a given case will 'depend[ ] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *United States v. Brown,* 415 F.3d 1257, 1268 (11th Cir. 2005) (quoting *Kumho Tire,* 526 U.S. at 150).

Upon reviewing the paper record and Plaintiff's motion, we concluded that a sufficient prima facie case had been made for questioning the reliability of the expert's opinion. Consequently, the Court convened a *Daubert* hearing to allow the parties to

present any supporting or contrary evidence or testimony and for the Court to better understand the scientific and technical foundation for expert Will's conclusion.

At that hearing, Wills explained in detail during the hearing the methodology that he used in forming his opinions. During the course of investigation, Wills examined a sample of the Catalina sewer pipes. The particular pipes that failed here came from certain apartments in the complex and were part of the horizontal runs of a commonplace gravity sewer system. He visually examined the pipes and also examined them under a light microscope in his laboratory. He then removed portions of the pipes and took them to a scanning electron microscope laboratory at Florida International University where he conducted imaging to produce photographs of the surfaces of the pipes. These examinations showed that the piping in question ranged from two to four inches, had a wall thickness of one-quarter inch and did not have calcareous deposits.

In determining the corrosion rate of the pipes, Wills in effect conducted a "soft water analysis." During the hearing, he explained that calcareous deposits normally protect the piping from corrosion. Calcareous deposits are formed by hard water passing through the pipe and depositing minerals that insulate the interior of the pipe from the effects of corrosion. Tap water in South Florida, as in most other communities, is hard water. When a particular pipe is used as a sewage line, however, the calcareous deposits that would normally form as a result of the hard water are stripped away from the pipe. Therefore, even though hard water is passing through the pipes, the pipes are corroding the same as if soft water was passing through. This is because there are sufficient pH changes in sewer water that prevent it from retaining its hard water qualities. Wills explained that, for example, when someone dumps a Coca-Cola or pasta sauce down the

drain, the acidic nature of the product dissolves any calcareous formation in the pipe, leaving the surface of the pipe exposed to corrosion as if soft water was used.

Wills then consulted several published texts and adopted the most conservative corrosion rate of iron, which he found in a textbook written by Herbert H. Uhlig and R. Winston Revie.  Using Uhlig's corrosion rate of 0.01 inches per year and the wall thickness of the cast iron pipe, which he found to be .25 inches, Wills concluded that the cast iron pipes at Catalina had a life expectancy of twenty to thirty years, and not the hundred years expectancy common in drinking water systems.  Under those circumstances, Wills concludes that normal rates of corrosion are likely the cause of the failure of the pipes at Catalina, as opposed to an extraordinary event like muriatic acid damage as alleged by Plaintiff's complaint.

Plaintiff's expert generally agreed that Wills's soft water analysis was accurate in and of itself.  Plaintiff contends, however, that this analysis is too speculative and unreliable because the water coming into the apartments from the original source is hard water and Wills has not conducted or reviewed any particular experiments or studies as to how that water evolves from normal residential use.  Plaintiff also challenges the reliability of Wills's expert opinion on the basis that Wills inappropriately relied on Uhlig's graph. Plaintiff points out that the Uhlig graph is itself based on a graph found in a study performed by Whitman, Russell & Altieri ("Whitman study") in 1924.  Uhlig was interested in demonstrating how pH balance affects corrosion.  He, therefore, simplified the graph in the Whitman study by leaving out all reference to how oxygen saturation affects corrosion rate.  Uhlig recreated the Whitman graph by multiplying the graphical information in the Whitman graph by an oxygen saturation rate of five cubic centimeters of oxygen per liter, which is the amount of oxygen in milliliters per liter at sea level.

Wills rebutted this charge with the explanation that five cubic centimeters of oxygen per liter at sea level is the amount of oxygen that is present in typical water that is exposed to air. Wills also explained that a gravity sewer system like Catalina's is an open air system and that such systems always have air vents. Thus, the oxygen content in those pipes would be five cubic centimeters of oxygen per liter.

In the end we conclude that the crux of the dispute here lies with Wills's application of a generally accepted soft water analysis, which is based itself on commonly relied upon sources and literature, to a specific set of facts that may – or may not – call for application of that analysis. Plaintiff persuasively argues that Wills's application and conclusion are wrong because he is largely relying upon assumptions that he has not independently verified. But that argument rings too much like a challenge to the accuracy of his results, and less to the general reliability of his analysis. As in *Quiet Technology,* the Court finds that the flaws in the analysis that Plaintiff points to are more properly the subject of cross-examination at trial, and do not support the wholesale exclusion of this evidence and this analysis from the jury. *Quiet Technology,* 326 F.3d at 1345 ("Thus, the alleged flaws in [the] analysis are of a character that impugn the accuracy of his results, not the general scientific validity of his methods.").

The Court is satisfied that Wills sufficiently explained why Uhlig's graph is still appropriately used to determine the rate of corrosion in cast iron drain pipes. Wills showed that Uhlig's graph illustrates how the corrosion rate is consistent within a range of pHs. This is an important factor in analyzing the corrosion rate of a drain pipe used to dispose of sewage since pH fluctuates in sewage. Because the corrosion rate remains the same in pH levels of four to ten, the .01 inches per year rate of corrosion found in

Uhlig's graph is arguably appropriate, for *Daubert* purposes, given that the drain pipes are used as sewer lines.

Wills testified that Uhlig is a recognized expert in the field of corrosion. His graph shows that, in high pH conditions, the corrosion rate of iron drops down to virtually nothing. A situation where there is no corrosion would be one where calcareous deposits form on the surface of the pipe, protecting it from corrosion. From about a pH of ten to about a pH of four, the corrosion rate of iron, according to Uhlig's graph, is approximately .01 inches per year. Wills testified that this pH range is consistent with the sewage exposure at Catalina or at anyone's house. If the pipes corrode at a rate of .01 inches per year and the pipe is .25 inches thick, one would expect that the pipes would perforate in the 36 years that the Catalina apartment complex has been in existence.

Wills was previously retained as an expert in another case concerning the rate of corrosion of cast iron drain pipes in which he prepared an expert report. Wills concedes that his expert report in that case is very similar to his report in the present case. Wills testified that he submitted his report regarding the rate of corrosion of cast iron drain pipes for peer review to his peers, but only within his company.

It is true that, during cross-examination, Wills confirmed that he has not conducted any independent tests to determine the life expectancy of cast iron pipes. He also has not performed any independent tests to determine whether the drain pipes at Catalina were alkaline neutral or acidic.[2] He did, however, testify that, given his experience in the field of corrosion, a sewer line would be alkaline neutral or acidic at different times.

---

[2] This refers to the levels of pH that can be found in the drain pipes.

He also did not perform any tests to determine whether the tap water at Catalina was hard or soft. However, Wills again testified that he did not have to perform a test because, given his experience, he recognizes that the variability in pH that would be present in sewer water coming from the apartment would prohibit the formation of calcareous deposits in the piping. As a result, the pipe would be as susceptible to corrosion as a pipe conducting soft water rather than hard water. Wills also testified that he did not find any calcareous deposits on the pipe that he examined, which confirms that his soft water analysis was appropriate in this case.

Plaintiff does not seem to dispute that Wills's method, i.e., dividing the thickness of the pipe by the rate of corrosion, is reliable. Rather, Plaintiff contends that Wills's adoption of Uhlig's .01 inches per year rate of corrosion is faulty. Thus, again, the alleged flaws in Wills's analysis go to the accuracy of his conclusions, and less to the general scientific validity of his methods. That is what cross-examination will highlight at trial, but not enough to exclude the expert's analysis altogether. *E.g., Quiet Technology,* 326 F.3d at 1343-46 (affirming district court's admission of challenged expert testimony notwithstanding alleged incorrect assumptions and calculations used by expert, failure to consider all variables, and failure to adequately test his conclusions); *Cummings v. Standard Register Co.,* 265 F.3d 56, 65 (1st Cir. 2002) ("whatever shortcomings existed in [the expert's] calculations went to the weight, not the admissibility, of the testimony"); *In re TMI Litig.,* 193 F.3d 613, 692 (3d Cir. 1999) ("So long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors['] scrutiny for fear that they will not grasp its complexities or satisfactor[ily] weigh its inadequacies.").

Plaintiff indeed has strong points to make on cross-examination and at trial. That includes the fact that, notwithstanding Wills's conclusion, the cause of the acidity level of the water at Catalina was, more likely than not, more greatly affected by the introduction of the miriatic acid into the system, rather than whatever household wastes were funneled down the sewer system. The jury, after all, could conclude that, absent any hard evidence to the contrary from Defendant, the muriatic acid had a greater impact on the corrosion to the pipes than what would be anticipated. That may be sufficient for the jury to find in Plaintiff's favor. But whether or not that is the case, the bottom line is that Plaintiff's many well-founded and reasonable criticism's of Wills's analysis must be weighed and considered by the jury at trial.

### C. *Helpfulness of Expert's Testimony*

Plaintiff has not challenged Wills's testimony on the basis that it is not relevant to an issue in this case. Any relevance arguments that Plaintiff appears to make falls under the second aspect of relevance discussed in *Daubert*. This is the requirement that the disputed evidence "have a valid scientific connection to the disputed facts in the case." *Quiet Technology*, 326 F.3d at 1347 (citing *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999)); *see also Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."). Wills's testimony must thus be excluded, even if it constitutes scientific knowledge, if it is not scientific knowledge for purposes of the issues in the case.

The Court has already found, however, that Wills's methodology is sufficiently reliable to show that the corrosion to these pipes was, more likely than not, based primarily on the expected life expectancy of the cast iron drain pipes at Catalina. That conclusion may certainly be helpful to the jury in reaching a final judgment in this case.

### *IV.   CONCLUSION*

For the reasons stated above it is hereby, **ORDERED AND ADJUDGED** that Plaintiff's *Daubert* Motion to Preclude the Testimony of Defendant's Expert David Wills [D.E. 98] is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 2nd day of July 2007.

_____
EDWIN G. TORRES
United States Magistrate Judge